Hawkins, J.,
delivered the opinion of the Court.
On the 12th of September, 1860, Henry Walker et al. filed their bill in the Chancery Court at Sneedville, against Sarah Walker et als., praying the partition, or a sale for the purposes of partition and distribution, of one slave and a tract of land, situate in Hancock County, of which one Edward Walker, the husband of defendant, Sarah, and ancestor of complainants, and the other defendants, had died seized and possessed.
*302 At the July Term, 1861, of said Court, a decree was pronounced, directing the Master to sell said land, on a credit of one and two years, taking notes, with good security, bearing interest from date. The Master, in obedience to the decree, proceeded to sell said land, when one Henry Walker became the purchaser, at the price of $1,900.
At the January Term, following, said sale was set aside, and the Master ordered to re-sell said land, upon the same terms as he was directed by the decree at the former term. And in obedience to this latter decree, the Master proceeded, on the 3d day of March, 1862, to re-sell said land, when one C. K. Coleman became the purchaser, at the price of $2,105; of which $100 was paid in cash, and for the payment of the balance, Coleman executed two notes, with one C. C. Ramsey as his surety, each for the sum of $1,002.50; one due at twelve months, and the other at two years, bearing interest from date, and payable to “Wm. McNeill, Special Commissioner . for the heirs of Edward Walker, deceased.”
On or about the 26th day of the same month in which he had made the purchase, and executed said notes, Coleman offered to pay off said notes, to said Commissioner, in Tennessee, Alabama, and perhaps other bank notes, which were refused by the Commissioner, who said he would take Confederate Treasury Notes; and thereupon, said Coleman paid off said notes in Confederate Treasury Notes, and deposited with the Master, in the same kind of currency, the full amount of the interest which would be due upon the notes at maturity, with *303 tbe -understanding, tbe same should be returned to him, if not required to discharge him from liability on account of said notes; and thereupon said notes were delivered to Coleman by the Master. Soon thereafter, and without having made any report of the sale, or of said payment, the Master and Commissioner died; and thus matters stood, until the January Term, 1863, when a decree was pronounced, directing the Master to take proof and report, whether or not said land had been sold by the former Master; and if so, when, to whom, and for what price; . and also, whether or not the purchase money had been paid; and if so, when and to whom. The Master reported to the same term, that the land had been sold by the former Master, and purchased by Coleman, as before stated, and that the purchase money had been paid to the former Master, by Coleman, on the 26th of March, 1862. This report being unexcepted to, was, by decree of the Court, confirmed, and the title to the land was vested in Coleman; but, during the same term of the Court, another decree was pronounced, suspending the former decree until the further order of the Court, and leaving open the question of payment, to be contested by the parties interested, and ordering a reference to the Master. The latter decree not having been complied with, was revived at the January Term, 1866.
On the 24th of January, 1866, one of the complainants, Henry Walker, filed what is called a supplemental bill, in the cause, against Coleman, in which it is alleged, that said payment was void, and that Coleman was disposing of his property for the purpose of defeating any *304 recovery which might be had against him, in this cause, and praying for writs of attachment. An attachment was granted, issued and levied upon the lands of Coleman, including the tract bid off by him at said sale.
Coleman, in his answer to the supplemental bill, states, in substance, that it was announced by the crier at said sale, that the Master would take the currency of the country in payment of the purchase money for said land; and that until that announcement, he had studiously refrained from bidding for the land.
From the report of the Master, made in obedience to the decree revived at the January Term, 1866, filed on the 21st of June, 1866, it appears said land was sold for good current money, and it was announced that specie would not be required.
It also appears that Coleman executed his note to the guardian of the minors in the cause, for their portion of the purchase money, being the sum of $594.97; for which amount, said guardian receipted Coleman, who was allowed a credit for the same by the Master; and the balance only, on the notes, with interest, was paid the Master in Confederate Treasury Notes.
Upon a final hearing of the cause, His Honor, the Chancellor, being of the opinion that the pretended payment, by Coleman, to the Master, in Confederate Treasury Notes, was fraudulent and void; and that the passing of Confederate Treasury Notes was contrary to law, and therefore could not constitute a valid payment; and being further of the opinion, that, inasmuch as said notes are for dollars generally, unless there was some fraud or mistake in the execution of the same, the terms of *305 the written contract cannot he varied by parol testimony, so as to give the maker the right to pay the notes in any currency hut dollars. Held, that said notes were due and unpaid, except as to the amount settled with the guardian; that they he set up, and that the successor of the Master to whom they were made payable, recover the balance unpaid, against Coleman, his security being dead.
From this decree, Coleman has appealed to this Court. There is no dispute about the facts of the case; and the only question presented in the argument, for our consideration, is: Did the payment of Confederate Treasury Notes to the Master, under the circumstances of the ease, constitute a valid payment, and operate to discharge the maker from further liability upon his notes? We have repeatedly held, “that Confederate Treasury Notes were issued without lawful authority, and for an illegal and treasonable purpose, and that the Courts of the country would not lend their active aid to enforce contracts based upon them. But, for the repose of society, when contracts, or other transactions, were executed, we would not, although predicated upon Confederate notes, disturb them.” See manuscript opinion, Henly et al. vs. Franklin and Cage, decided at Nashville, last Winter. And in the case of Wright & Cantrell vs. Overall, 2 Coldwell, 336, we held, that Confederate Treasury Notes, “having been issued against public policy, for an unlawful and illegal purpose, and without any authority of law of which this Court can take cognizance, must not be held as worthless bank paper, issued by a legally *306 constituted corporation, but as paper issued without any legal authority whatever, and therefore worthless in the payment for property, or of pre-existing debts.”
Here are two propositions. One is, that Confederate Treasury Notes are worthless in the payment of preexisting debts, or for property; the other is, that for the repose of society, when contracts' or other transactions are executed, we will not disturb them, although predicated upon Confederate Treasury Notes.
It is now insisted in argument, in order to take this case out of the operation of the first proposition stated, that it is an executed contract, and comes within the principles of the case of Henley et al. vs. Franklin et al., before referred to. The facts of the two cases, are widely different. In that case, a decree had been rendered against the purchaser, and his surety upon the note, in favor of the Commissioner; and by the same decree, the Clerk, as Commissioner, was‘ directed to collect the money still due on the sale notes, and distribute it to the parties entitled. An execution had been issued upon the judgment, which came to the hands of the Sheriff, and was, by him, returned, indorsed “Satisfied in full.” The payment to the Sheriff was made in Confederate Treasury Notes, which were shortly thereafter duly paid over to the Clerk, in whose favor the judgment was pronounced, and who was the plaintiff in the execution, and who had been directed by the decree in the cause, to distribute the fund among those entitled; and he, thereupon, made an entry upon his execution docket, in these words: “Received of George Love, *307 Sheriff, sixteen hundred and fifty-nine dollars and eighteen cents, in full of James Eranklin’s note.
“Eeh’y 1st, 1862. John L. Bugg, Clerk.”
The note mentioned in this entry was the same upon which the judgment had keen rendered. There was afterwards a motion entered to revive the judgment; and this Court held, that the case fell under the rule before stated, as applicable' to executed contracts, and affirmed the judgment of the County Court, refusing the motion. In holding that that case fell under the rule before stated in reference to executed contracts, we think the Court went to the verge of the law; and whilst we adhere to the rule, we are unwilling to go further in its application, than we did in that case.
In the case now under consideration, within less than one month from the date of the execution of • the notes, one of which had eleven, and the other twenty-three months to run before maturity, and before any report of the sale had been made or confirmed, the maker of the notes, in suspicious haste, goes to the Commissioner to whom they are made payable, and proposes to pay them off in bank paper of doubtful and uncertain value, which was refused by the Commissioner ; and, thereupon, he paid to the Commissioner the full amount of the balance upon the notes, after deducting the amount of the receipt of the guardian before mentioned, in a currency issued without authority of law, and for an unlawful and .treasonable purpose. And so anxious was the maker to discharge his liability in this kind of currency, before the maturity of his notes, that he deposited with the Commissioner, the full amount of interest which would be due upon *308 the notes at maturity. We are wholly unable to discover, from this record, any fair and legitimate motive, by which the maker of these notes could have been prompted to make payment upon these notes at so early a day, and including interest accruing thereon to the date of their maturity; and we are left to infer his object was to discharge his liability, and thus, in advance, fraudulently, and in this extraordinary manner, secure to himself the benefit of his purchase, by the payment of notes which he apprehended would be worthless, for any purpose, at the maturity of his notes. To bring a case within the rule before stated, as to executed contracts, the payment must have been made in the ordinary manner of business transactions, so as to be freed from all suspicions of fraud, and appear to have been fair and bona fide, in every respect.
But another question is presented in the consideration of this case. It is this: Did the Commissioner, at the time it was alleged this payment was made to him, have the right to receive payment upon said notes, in any kind of money, so as to discharge the maker from all liability thereon?
In obedience to a decree of the Court, the Commissioner offered the land for sale. Coleman being the highest bidder, the same was struck off to him. He paid $100.00 in cash upon the amount of his bid, and executed his notes for the balance, due at one and two years, with interest from date. And thus matters stood up to the time of the alleged payment. The sale had never been confirmed by the Court, nor had any report of the sale, in fact, been made. We think it clear, upon *309 authority, that, at the time this payment is alleged to have "been made, the sale was incomplete, and the transaction amounted to nothing more than a hid by Coleman, or an offer, on his part, to become the purchaser, at the price bid by him, and to secure the payment of the purchase money, by the execution of his notes, in compliance with the terms of the sale, as prescribed by the decree.
To render the sale complete, it was indispensable that the same should have been confirmed by the Court. The Commissioner had no power to complete the sale, or close the contract — that could be done only by the Court. The powers of the Commissioner in the premises, as touching the sale, were derived alone from the decree, and except to report the transactions to the Court, had been exhausted. The Court may have rejected the offer of Coleman, as it had the offer of Walker, upon a former occasion, in this case; or, if satisfied with his offer, may have confirmed the sale, upon a report of the transaction being made to it; and until such confirmation, there existed no complete and obligatory contract as to the sale and purchase of the land, neither was the purchaser entitled to the possession of the land. These rules apply to sales of real estate, while it is, perhaps, true that a different rule, in some respects, applies to sales of personalty, especially where possession of the property accompanies the purchase.
Applying these principles. to the case under consideration, it is not only apparent it does not come within the rule as to executed contracts before stated; but it follows, that the Commissioner had, at the time the pay *310 ment is alleged to have been made, no right to receive from the purchaser or bidder, who had offered to become the purchaser, gold, or any thing else, in payment of his notes, so as to relieve him from liability. The sale was in fieri, and under the control of the Court; and the receipt of the money by the Commissioner, under such circumstances, can only amount to a deposit, by the bidder with the Commissioner, to be applied by him in the extinguishment of a liability which was then only contingent.
Suppose, that, prior to the action of the Court upon the report of the sale, Coleman had paid to the Commissioner, in lawful currency, the full amount of his notes, and, subsequently, the sale had been set aside, could it be insisted that Coleman had any lien upon the land, or that the owners of the land could be made liable to him, without having received the money? We apprehend no such proposition could be maintained.
A decree will be entered confirming the sale of the land, and confirming the decree of the Chancellor in all other respects.